Exhibit "A"

## AFFIDAVIT IN SUPPORT OF MOTION TO VACATE 28 USC § 2255, DECLARED UNDER 28 USC § 1746

This affidavit by Movant/Petitioner Jerry Elkins in support of his Motion to Vacate 28 USC § 2255 in regard to USDC Case No. S1:4:11CR241CDP, from the district of Missouri, explains in no uncertain terms, attorney/client conversations between the Movant and Counsel Ronald E. Jekins off the record in the months of October through December of 2012, when Elkins was pursuing trial in the above action. The discussions occurred at both the district court conference room and St. Louis County Jail - respectively.

### The Affiant

My name is Jerry Elkins, I am the defendant in the federal proceedings stated above. My Federal Registered Number is, 37828-013. I currently reside at the Federal Correctional Institution of Florence, Located in Florence, Colorado. I'm deposing voluntarily in this affidavit as to the trial events and discussion between myself and Counsel Ronald E. Jekins between the months of October 15, 2012 through December 7, 2012, based on my personal knowledge and provide the following:

Middle of October of 2012 at the District Courthouse

My Counsel [Ronald E. Jekins] 'Jekins' and I had an attorney-client meeting after the initial stages of my trial in the middle of October at the District Court courthouse conference room. Jenkins ran down during this meeting the expected itinerary of trial for the next few weeks. At this meeting I conveyed to counsel, my concerns about being shackled during the trial. I asked counsel, if it was necessary, because I was experiencing cramps, form not being able to move freely and how it looked to the jury. Jekins told me, he would look into it but believed that the shackles would have to remain on, because of US Marshal's security concerns. I asked Jekins, why would the Marshal's be concerned about me? Jekins said, it wasn't me pre se, but they probably have concerns with your co-defendants. I replied, I found it odd, being that there were 20 or so Marshal's in the courtroom at all times armed and standing or sitting right behind all of us. Jekins said, yeah, but that's how they do things. I told Jekins, I shouldn't have to be restrained because of my co-defendants security issues. I further said, how does he think the jury perceive me, shackled? You know, they can see me clearly I told counsel - because I'm at the outside of the conference table, facing them. I said, that the jury must see me as dangerous and that there has to be a reason to particularly separate me from society. I told Jekins, I can't even move around with the chains making noise and drawing additional attention to me. Also, I don't like that, I couldn't stand or move for I can participate in the trial when the judge came into the court, or if I wanted to speak with him (counsel). I told Jekins that, I believe the jurors must think I'm disrespectful on top of it all. Especially when, I don't stand and the government does. My Counsel said, I didn't have to worry about the standing part, because the Judge will understand, and have us remained seated. I said again, its not the Judge I'm concerned with its the jury. They're going to decide my case. Jekins told me he's look into it but he never pushed the matter.

Middle of November of 2012 at the St. Louis County Jail

    Jekins and I met again at the St. Louis County Jail around the middle of november. This meeting was after the court had allowed the admittance of surveillance recordings into evidence and government's witness Walter Lee and Brian Cook had testified. I spoke specifically to counsel Jekins about my and government's witness Allen Hunter's discussions played on the tape for the jury. I pointed out to Jekins that the recorded discussions were inaccurate. Case and Point, was Hunter's and my discussions about the Black New Years Event in St. Louis, and my quote played to the jury about "taking care of business," having been taken out of context in the recording. I told counsel, I was speaking about matters in Kansas——not Missouri, and they were pertaining to partying not violent acts. I told counsel, that the recording gaps proved the tapes were altered, and asked if he had notice them. He responded, that he had. I then told him, Hunter and my discussions were way longer than played by the government, and different. I told counsel, that either the government altered the recordings to omit their true content, or they intentionally erased the content of the call all together, so it couldn't be proven that any point in the discussion could be made other than theirs [government]. I then, told counsel that Walter Lee's and even Allen Hunter supported what I was telling him. Walter Lee said, the tape discussions were false, and Hunter couldn't remember the discussions either the way they were played.

    I then switched the conversation to ask counsel about the sealing of the tapes he had argued in the court, before they were actually played. I specifically asked, about 18 USC §2518. Jekins ran down the law in a nutshell. He had explained to me the recordings were both authorized and controlled by the court according to the law. I then asked, Jekins how many orders were authorized in my case. Jekins said, at least 3 were to his knowledge. I told Jekins thereafter, he did a lousy job then arguing on the tapes in court. Jekins asked me how, so. I told him because he hadn't put any emphasis on the 3 distint wiretap orders issued by 3 different judges, to show that the agents had ample time to alter the tapes; and that their excuse to have not seal them from the orders expiration was not satifactory, when 3 judges existed who could have accomendated any of their request. Especially, when it was the same agents who had participated in all the orders. Moreover, I told counsel my recordings derived under the first order, where I'm not even listed under its authorization, but never-the-less record. And that the first order hadn't been sealed for some 60 days plus after its expiration. I asked counsel why did he argue that last order with the first two. Counsel said, I made some good points, but he put forward all he could think in the court. I said yeah, because you failed to investigate the obvious - and I got screwed. Counsel then, said we could appeal the issues, if I lost the trial. I became upset, and told counsel what good does that do me now! They fabricated evidence! I'm innocent of their charges! That altered evidence had been submitted to the jury, it was a big part of their show - you can't change that damage on appeal, when you failed to object to it at trial. So don't like to me. Jekns said, that I shouldn't sweat it, because we have alternatives. I replied, sure we do but they're weak ones, you've showed me that. Jekins said, it was a complex matter and he'd speak to me latter, when he investigates more into them along with my points. I closed our discussions by telling counsel he was lost, because his alternative arguments were meritless and lacked strength - when we had a simple and straight forward one. I let him know, that I thought the Judge seemed perturbed about the whole tape matter at trial and gave him [counsel] every opportunity to prove out point, and he blew it.

Exhibit "A"

Late November of 2012 at the St. Louis County Jail

    Jekins and I met again at the St. Louis count jail in late November after the government's witness Brian Cook testified, and surveillance tapes were played for the jury. Counsel wanted to let me know what are next steps were at trial. I let counsel know during this meeting that Cook was lying about the Corey 'corn dog' shooting incident that occurred in Denver Colorado. I let counsel know that, I wanted a couple of witnesses to testify on my behalf that could contradict Cooks testimony as false. One witness in particular I thought important for counsel to investigate and obtain was 'Turbo' (Stephon Grisby, AKA Turbo). I let counsel know Turbo was willing to testify on my behalf, according to family members, and that Cook had lied about his having been with Turbo at the day of the corn dog shooting incident. Moreover, he [Turbo] claimed to have first hand information straight form cook just prior to his testimony as to why he (Cook) was actually testifying. I didn't know the exact details of that, but understood it related to his wife, having affairs with club members on numerous occasions, and my not wanting to intervene between the parties on his behalf. That angered him I was told. I told counsel Turbo knew Cook better than I had. And that his testimony would be helpful if not pertinent to our defense to confront Cook's lies. Jekins said, he wasn't going to put on a soap opera. I told counsel, you have to check it out, soap opera or not. I told counsel that, I believed the governments case to be a soap opera. I reiterated the evidence shown thus far as such: First, the government introduces a gun into evidence, taken from a ruse traffic stop which had nothing to do with proving my case; Next, they call my club a gang over and over, where the court has to warn them on it several times; Then they bring in Cook late and unexpected to us, the government says he's been threaten to excuse its lateness, and they weren't sure he would testify. However, Cook says, that didn't happen (the threats) and he was always going to testify as far as he knew. Cook then talks about a serious matter as if I instigated it and was there; Then the government plays recordings that were not sealed legally and alters them so they can play two different conversations out of context, to infer something else that is totally prejudicial; Then you get Walter Lee and Allen Hunter, where Lee says, the tapes regarding him are false, and Hunter not recalling the conversations like I'm telling you, now. Not to mention I told counsel, I'm shackled like an animal the whole time right in front of the jury, while I have 20 armed guards standing behind me!!! And your say Turbo's testimony would be like a soap opera!

    Counsel said he heard what I was saying, but tried to resure me Cooks testimony meant nothing. Because I hadn't been indicted on the matter, nor was the gun anything for the same reasons. I blew up again as told him he was lost, because if it meant nothing to the government it wouldn't have put emphasis on their being introduced into evidence to begin with! I told counsel it was a ploy to prejudice me against the jury if noting else along with my association with my club. I asked counsel if understood what I was saying? I told counsel if he doesn't investigate Turbo I wanted to take the stand, to explain myself and whereabouts, not mention all the evidence introduce. Jekins said he's advising me not to do it. I then told him to get Turbo then. Jekins then got emotional and said your not taking the stand. I told him its my right and its my trial so you put me on the stand or I'll let the judge know about your unprofessional representation and stop this whole thing. Counsel then switched the topic to his health. Jekins said, look Elkins I've

Exhibit "A"

just had surgery for cancer, I'm doing chemotherapy and I'm in pain, my meds aren't doing me much good either. Jekins then said he had researched my case and the government's evidence is weak - and that I have a good chance of winning at trial. But he wasn't going to make this case a dog and pony show. Especially under his condition at the moment. I told counsel, I understood his situation, but let him know he needs to look at mine. I could get a hundred years from his not defending me to the best of his ability. And if he's not up to it, that it provides an opportunity to either postpone the trial, and investigate my witnesses while he recovers, or until they can replace him. Jekins said that it wasn't necessary - that I just need to let him do what he thinks is best. I said maybe, you don't know what's best under your condition. I then asked him if his condition was the reason he hadn't participated in the side bars. Counsel said yeah - somewhat but he had spoke with co-defendant's Frys attorney Lynch to let him on on what's up in the side bars. I told counsel, that Lynch doesn't represent me and that he does. I further told him Lynch's interest is his client, he might miss something for yours (me). Jekins became emotional and said some personal matters about himself again and his representation but in nutshell, said he's not going to let me take the stand. I said, then he needed to do his job, because its been very weak thus far. I also asked him to think about what I've said, and also think about how the jury sees the trial. I said finally that if he can do that, he can't say my asking him to put Turbo on the stand is crazy. I told him the only way counsel was right if I were tried alone - but I'm not. All the government's evidence at this point was only to prejudiced me they had nothing else to prove their case. Counsel said fine he'd do that. Before he left, I had a thought about our discussion and believed even if he were to put me on the stand I would still look like an idiot with my shackles going to the stand, and let him know, to put some thought into get rid of them too. He never did either. The next time we met he was against it all, and tried to resure me we had a winning case and at worst we'd win on appeal.

Declared under 28 USC § 1746
this 25 day of April, 2016,

s/ _____
Jerry Elkins
Reg. No. 37828-013
F.C.I. Florence
P.O. Box 6000
Florence, CO 81226-6000

4 of 4

body with a firearm, purposely causing the death of the victim, in violation of Chapter 720, Act 5, Section 9-2(a)(1) of the Illinois Compiled Statutes 1992, as amended.

All in violation of and punishable under Title 18, United States Code, Section 1959(a)(1).

## COUNT XIII.
### (18 U.S.C. §1959(a)(5) – Attempt to Commit Murder in Aid of Racketeering Activity)

40. The allegations contained in paragraphs 20-22 are realleged and incorporated as if fully set forth herein.

41. On or about January 2, 2011, in the Northern District of Illinois, the Defendant,

**ANTHONY ROBINSON, a/k/a "Blade,"**

for the purpose of maintaining and increasing position in "WOS," an enterprise engaged in racketeering activity, with the intent to commit a specific offense, to-with: First Degree Murder, did without legal justification and with the intent to kill, shoot a victim whose identity is known to the Grand Jury about the body with a firearm, an act constituting a substantial step toward the commission of First Degree Murder, in violation of Chapter 720, Act 5, Section 8-4 (720 -5/9-1(A)(1)) of the Illinois Compiled Statutes 1992, as amended.

All in violation of and punishable under Title 18, United States Code, Section 1959(a)(5).

## COUNT XIV.
### (18 U.S.C. §1959(a)(5) – Conspiracy to Commit Murder in Aid of Racketeering Activity)

42. The allegations contained in paragraphs 20-22 are realleged and incorporated as if fully set forth herein.

43. On or about January 29, 2011, in the Northern District of Illinois and elsewhere, the Defendants,

ALLAN HUNTER, a/k/a "Dog,"
DOMINIC HENLEY, a/k/a "Bishop,"
JERRY ELKINS, a/k/a "Shakka," "Shaca,"
MARSHALL FRY, a/k/a "Bo," "Big Bo,"
RASHEED JAMAL BRANDON, a/k/a "Diamond," and
WALTER LEE, a/k/a "Lil Dude,"

for the purpose of maintaining and increasing position in "WOS," an enterprise engaged in racketeering activity, did, with the intent that the offense of First Degree Murder be committed, agreed with each other to purposely cause the deaths of an individual or individuals whose identities are unknown to the Grand Jury, and an act in furtherance thereof was committed, to-wit: one or more named individuals traveled to East St. Louis, Illinois, one or more named individuals engaged in conversations regarding the murder of unnamed members of the Outkast OMG, and one or more named individuals traveled to a specific site at which the intended victims were known to be located and did abort a planned shooting only after discovering a heavy law enforcement presence in the area, in violation of Chapter 720, Act 5, Section 8-2 (Conspiracy) (720-5/ 9-1(A)(1)),

All in violation of and punishable under Title 18, United States Code, Section 1959(a)(5).

## COUNT XV
### (18 U.S.C. §1959(a)(5) -- Conspiracy to Commit Murder in Aid of Racketeering Activity)

44.   The allegations contained in paragraphs 20-22 are realleged and incorporated as if fully set forth herein.

45.   On or about February 15, 2011, in the Northern District of Illinois and elsewhere, the Defendants,

ALLAN HUNTER, a/k/a "Dog," and
CARLOS WESLEY ROSE, SR., a/k/a "Pit Bull,"

FILED

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JUN 21 2012

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. S1-4:11CR00246 CDP (FRB) |
| v. | ) | |
| | ) | |
| JAMES C. SMITH, a/k/a "Animal," | ) | Count I |
| FREDERICK MORGAN, a/k/a "Low Rider," | ) | Counts I, VIII, XVI |
| DOMINIC HENLEY, a/k/a "Bishop," | ) | Counts I, IV, V, XIII |
| TIMOTHY BALLE, a/k/a "T," | ) | Counts I, IV, V, VII |
| ANTHONY ROBINSON, a/k/a "Blade," | ) | Counts I, X, XI, XIV, XV, XVI |
| JERRY ELKINS, a/k/a "Shakka," "Shaca," | ) | Counts I, XIII |
| MARSHALL FRY, a/k/a "Bo," "Big Bo," | ) | Counts I, IX, XIII |
| CURTIS COLE, a/k/a "Tomahawk," | ) | Counts X, XI |
| JERRY PETEET, a/k/a "Angel," | ) | Counts I, II, III |
| ANTHONY OWENS, a/k/a "44," "Pharaoh," and | ) | Counts XII, XVI, XVII |
| TREVOR SEYMOUR, a/k/a "Cyclopse," | ) | Counts I, VI, VIII |
| | ) | |
| Defendants. | ) | |

## SUPERSEDING INDICTMENT

The Grand Jury charges:

### INTRODUCTION

#### The Racketeering Enterprise

1.   At all times relevant to the Indictment, in the Eastern District of Missouri and

elsewhere, the Defendants,

JAMES C. SMITH, a/k/a "Animal,"
FREDERICK MORGAN, a/k/a "Low Rider,"
DOMINIC HENLEY, a/k/a "Bishop,"
TIMOTHY BALLE, a/k/a "T,"
ANTHONY ROBINSON, a/k/a "Blade,"
JERRY ELKINS, a/k/a "Shakka," "Shaca,"
MARSHALL FRY, a/k/a "Bo," "Big Bo,"
JERRY PETEET, a/k/a "Angel," and
TREVOR SEYMOUR, a/k/a "Cyclopse,"

A8

Carlyle FLEMING was discovered to be in possession of a .22 caliber Beretta handgun and eight (8) live rounds.

19.38  On or about June 30, 2010, Toney SIMS sold 56 grams of cocaine base ("crack") to a fellow WOS member in Chicago, Illinois.

19.39  On or about July 15, 2010, Toney SIMS sold 57 grams of cocaine base ("crack") to a fellow WOS member in Chicago, Illinois.

19.40  On or about July 17, 2010, Midwest Region President Myron Farris was shot in the head and killed in Chicago, Illinois. Shortly thereafter, Allan HUNTER was installed as the new Midwest Region President.

19.41  On or about July 28, 2010, Toney SIMS acted as a broker for a transaction in which a WOS member sold a .20 gauge shotgun to a fellow WOS member.

19.42  Between August 4 and August 7, 2010, hundreds of WOS members from across the United States attended a OMG "roundup," that is, a large-scale rally including several groups, held in Columbia, Missouri.

19.43  On or about August 2, 2010, **MARSHALL FRY** and other members of the WOS went to the Hells' Lovers clubhouse in Denver, Colorado. **MARSHALL FRY** was driving a dark colored sport-utility vehicle. As he neared the Hells' Lovers clubhouse, **MARSHALL FRY** fired two shots from a short-barreled shotgun at the clubhouse, which was occupied by several members of the Hells' Lovers. At least three Hells' Lovers members exited the clubhouse and returned fire.

19.44  On or about August 10, 2010, **DOMINIC HENLEY** presided over a WOS meeting in St. Louis, Missouri, during which he speculated that the murder of Myron Farris was

21

A9

19.60  On or about January 27, 2011, Allan HUNTER sold 63 grams of cocaine base ("crack") to a WOS member in Chicago, Illinois. Allan HUNTER's source of supply for the cocaine base ("crack") was Maurice THOMAS.

19.61  On or about January 29, 2011, **DOMINIC HENLEY, JERRY ELKINS, MARSHALL FRY**, Allan HUNTER, Rasheed Jamal BRANDON and Walter LEE conspired to shoot and kill members of the Outcast OMG, whose members had assembled in East St. Louis, Illinois, for a dance. At the direction of **JERRY ELKINS, MARSHALL FRY** and Rasheed Jamal BRANDON traveled to East St. Louis, Illinois, and met with Walter LEE and **DOMINIC HENLEY**, who were already there, in order to shoot and kill the Outcast. The WOS group aborted the mission when they discovered numerous State and Local law enforcement officers near the location of the gathering the Outcast members were attending.

19.62  Between January 29, 2011 and February 5, 2011, Allan HUNTER threatened to kill or seriously injure a former WOS member who had left the WOS and was later seen wearing the "colors" of another motorcycle club. Allan HUNTER agreed to forego killing or seriously injuring the recipient of the threat if he paid Allan HUNTER money.

19.63  On or about February 15, 2011, Carlos Wesley ROSE, Sr. informed Allan HUNTER that he was coming to Chicago, Illinois, for a party, and that he was bringing Allan HUNTER the "present" that HUNTER had requested. The "present" consisted of a pipe bomb that HUNTER and ROSE intended to use against members of rival motorcycle clubs in Chicago.

19.64  On or about February 18, 2011, Oldham County Police Department officers conducted a traffic stop on a vehicle in which Carlos Wesley ROSE, Sr. was traveling. During a subsequent search of the vehicle, officers discovered Tannerite (a mixture of ammonium nitrate and aluminum powder), a highly explosive mixture. It was concealed inside his WOS vest, along

## COUNT XII.
### (18 U.S.C. §1959(a)(1) and 18 U.S.C. §3 – Accessory-after-the-Fact to Murder in Aid of Racketeering Activity)

41. The allegations contained in paragraphs 20-22 are realleged and incorporated as if fully set forth herein.

42. On or about January 2, 2011, in the Northern District of Illinois, the Defendant,

**ANTHONY OWENS, a/k/a "44," "Pharaoh,"**

knowing that an offense against the United States had been committed, to-wit: Murder in Aid of Racketeering Activity in violation of Title 18, United States Code, Section 1959(a)(1), received, relieved, comforted, and assisted the offender in order to hinder or prevent his apprehension, trial, and punishment, in violation of Title 18, United States Code, Section 3, and punishable under Title 18, United States Code, Section 3.

## COUNT XIII.
### (18 U.S.C. §1959(a)(5) – Conspiracy to Commit Murder in Aid of Racketeering Activity)

43. The allegations contained in paragraphs 20-22 are realleged and incorporated as if fully set forth herein.

44. On or about January 29, 2011, in the Northern District of Illinois and elsewhere, the Defendants,

**DOMINIC HENLEY, a/k/a "Bishop,"**
**JERRY ELKINS, a/k/a "Shakka," "Shaca," and**
**MARSHALL FRY, a/k/a "Bo," "Big Bo,"**

for the purpose of maintaining and increasing position in "WOS," an enterprise engaged in racketeering activity, did, with the intent that the offense of First Degree Murder be committed, agree with each other, and with Allan HUNTER, and Rasheed Jamal BRANDON, to purposely